ROSIE J. DOE ET AL. *v.* EDWARD MAHER ET AL.

SUPERIOR COURT    JUDICIAL DISTRICT OF    FILE NO. 196874
NEW HAVEN

Memorandum filed April 9, 1986

*Martha Stone, Catherine Roraback* and *Shelley Geballe,* for the plaintiffs.

*Michael Arcari, Paige Everin* and *Richard Couture,* assistant attorneys general, for the defendants.

BERDON, J. The plaintiffs, Rosie J. Doe and her physician, Marshall Holley,[1] have brought this class action against the defendant commissioner of income maintenance (commissioner)[2] challenging the legality and constitutionality of Policy 275 of 3 Manual, Department of Income Maintenance Medical Assistance Program, c. III. (Revised January 22, 1981) (regulation).[3] The regulation restricts the funding of abortions under the Connecticut Medical Assistance Program (hereinafter medicaid); General Statutes § 17-134a et seq.; to those abortions "necessary because the life of the mother would be endangered if the fetus were carried to term."

The court concludes that the regulation exceeds the statutory authority of the commissioner and is violative of the due process clause (article first, § 10) and equal protection clause (article first, §§ 1 and 20), and more specifically the equal rights amendment (article fifth) of the constitution of the state of Connecticut.

Before setting forth the background and facts, and evaluating the statutory and constitutional claims of

[1] The court authorized the named plaintiff to prosecute this suit under the fictitious name of Rosie J. Doe. See *Buxton* v. *Ullman,* 147 Conn. 48, 50, 156 A.2d 508 (1959), appeal dismissed, 367 U.S. 497, 81 S. Ct. 1752, 6 L. Ed. 2d 989, reh. denied, 368 U.S. 869, 82 S. Ct. 22, 7 L. Ed. 2d 69 (1961). The plaintiff Marshall Holley is a licensed physician who practices in the city of New Haven and performs medicaid abortions.

[2] In addition to the commissioner of income maintenance, the treasurer of the state of Connecticut is also a party defendant. References to the commissioner also include his successor in office and the department of income maintenance and its predecessor, the department of social services and welfare. Of course, this is, in effect, a suit against the state of Connecticut. *Sentner* v. *Board of Trustees,* 184 Conn. 339, 342, 439 A.2d 1033 (1981).

[3] See footnote 10, infra; the regulation was adopted by the present commissioner Stephen B. Heintz's predecessor.

the plaintiffs, the court deems it advisable to put the case in its proper perspective. It is *not* "a referendum on the morality of abortion"; it does *not* seek to delve into "the profound questions about the moral, medical, and societal implications of abortion," and it does not attempt "to determine when life begins or at what point a fetus is a person." *Right to Choose* v. *Byrne,* 91 N.J. 287, 299, 450 A.2d 925 (1982). This case is concerned only with the narrow issue of funding of medically necessary or therapeutic abortions.[4] The issue of whether our state constitution mandates that the state fund nontherapeutic abortions for the poor has not been raised by the parties and is not addressed in this decision.[5]

I

## CHRONOLOGY OF THERAPEUTIC ABORTION FOR THE POOR IN CONNECTICUT

It is helpful to review the chronology of events pertaining to therapeutic abortions in Connecticut. Shortly after the Supreme Court of the United States in *Roe* v. *Wade,* 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147, reh. denied, 410 U.S. 959, 93 S. Ct. 1409, 35 L. Ed. 2d 694 (1973), held that the constitutional right of privacy protects a woman's right to terminate her pregnancy, the commissioner revised his policies to provide that therapeutic abortions would be funded through the state medicaid program. Prior thereto, the regulation permitted medicaid funding for abortions "only when necessary to preserve the physical life of the mother."

---

[4] The court uses the terms medically necessary and therapeutic abortions synonymously. The court defines medically necessary or therapeutic abortions as follows: abortions necessary to ameliorate a condition that is deleterious to a woman's physical and or psychological health.

[5] Cf. *Right to Choose* v. *Byrne,* 91 N.J. 287, 318–19, 450 A.2d 925 (1982) (Pashman, J., concurring in part, dissenting in part) (reasoning that the funding of nontherapeutic abortions, as well as medically necessary abortions, is mandated by the equal protection clause of the New Jersey constitution).

The commissioner, thereafter, made further changes in the regulation mirroring those of the federal medicaid program; title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.; which provides for partial reimbursement to the states of medical expenses for the poor. These changes in the federal program, referred to as the Hyde amendment,[6] restricted funding to abortions necessary to preserve the woman's life or, at varying times, to termination of pregnancies resulting from rape or incest.[7]

The regulation was in effect until July 17, 1979, when the Federal District Court in the case of *Women's Health Services, Inc.* v. *Maher*, 482 F. Sup. 725 (D. Conn. 1980) (*Women's Health Case I*), held that it was "not rationally related to any legitimate, articulated state interest and the exclusion of therapeutic abortions from medicaid coverage, being irrational, violates the equal protection clause [of the United States constitution]." Id., 735. The court in *Women's Health Case I* issued an injunction ordering the state to pay the expenses for all medically necessary abortions under its medicaid program. After the United States Supreme Court decided in *Harris* v. *McRae*, 448 U.S. 297, 100 S. Ct. 2671, 65 L. Ed. 2d 784, reh. denied, 448 U.S.

---

[6] "Since September 1976, Congress has prohibited—by means of the 'Hyde Amendment' to the annual appropriations for the Department of Health, Education, and Welfare (now divided into the Department of Health and Human Services and the Department of Education)—the use of any federal funds to reimburse the cost of abortions under the Medicaid program except under certain specified circumstances." *Williams* v. *Zbaraz*, 448 U.S. 358, 362 n.4, 100 S. Ct. 2694, 65 L. Ed. 2d 831, reh. denied, 448 U.S. 917, 191 S. Ct. 38, 65 L. Ed. 2d 1180 (1980).

[7] The current version of the Hyde amendment provides that the state will be eligible for federal reimbursement for the costs of abortion only if "the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported promptly to a law enforcement agency or public health service . . . ." Pub. L. No. 96-123, § 102.

917, 101 S. Ct. 39, 65 L. Ed. 2d 1180 (1980), that the Hyde amendment met federal constitutional standards, and in *Williams* v. *Zbaraz,* 448 U.S. 358, 100 S. Ct. 2694, 65 L. Ed. 2d 831, reh. denied, 448 U.S. 917, 101 S. Ct. 38, 65 L. Ed. 2d 1180 (1980), that the state could restrict the payment for abortions to the reimbursement limits provided in the Hyde amendment, the Second Circuit Court of Appeals reversed and remanded *Women's Health Case I. Women's Health Services, Inc.* v. *Maher,* 636 F.2d 23 (2d Cir. 1980) (the remand was granted because of the claim of the plaintiffs that *Women's Health Case I* was factually distinguishable from *McRae* and *Zbaraz*). On December 16, 1980, the District Court, Blumenfeld, J., denied the plaintiffs' petition to restrain the commissioner from enforcing the regulation, and on May 6, 1981, granted the state's motion to dismiss the case for failure to state a cause of action.

Thereafter, on February 15, 1981, the commissioner reinstated his prior restrictive policy on abortion by revising the regulation to coincide with the then current Hyde amendment.

On March 2, 1981, an action was commenced in the Superior Court of Connecticut for the Judicial District of New Haven entitled *Women's Health Services, Inc.* v. *Maher,* No. 190341 (hereinafter *Women's Health Case II*), seeking to declare that the regulation violated the constitution of Connecticut and to require the state to pay for all medically necessary abortions. *Women's Health Case II* was dismissed by the court, *Fracasse, J.,* on the grounds that the plaintiffs in that case had failed to exhaust their administrative remedies and that they lacked standing.

Effective July 15, 1981, the commissioner again revised the regulation by restricting the payment for abortions under the medicaid program to life-threatening conditions.

In August, 1981, the plaintiffs brought this action seeking class certification, a declaratory judgment and temporary and permanent injunctions. The court, *Berdon, J.,* entered, ex parte, a temporary mandatory injunction ordering the state to pay for the abortion of the named plaintiff, Rosie J. Doe.[8] At that time Doe was thirty-five years old, had five children, was a welfare recipient, and was eligible for medicaid. Although her life was not endangered as a result of her pregnancy, Doe required an abortion for medical reasons. After she became pregnant, it was necessary to perform a conization (a cutting of the cervix) in order to determine whether she had cervical cancer because the endocervical curetage showed dysplasia (precancerous cells). If an abortion were not performed, there would have been a risk that the conization would cause bleeding and hemorrhaging which could result in a miscarriage. Doe faced the possibility of further severe complications from the continuation of the pregnancy which included the following: She had been on methadone for the three preceding years. Her last two children had been born suffering from methadone withdrawal and they had to be hospitalized. If her pregnancy were to continue while she was on methadone, she also would have been placed at risk of cardiac arrest, shock, respiratory depression, circulatory depression and gastrointestinal problems. Because of Doe's age, her pregnancy could have caused further serious complications, including emotional and psychological distress.

On October 9, 1981, after hearing the parties, the court certified the following two classes: indigent pregnant women who qualify for medicaid and who desire a medically necessary abortion (hereinafter "poor

---

[8] Although the order was issued ex parte, it was done after an informal conference with counsel for the plaintiffs and the defendants. See also in this case "Memorandum of Decision and Orders" dated August 21, 1981.

women class"), and physicians who are certified by the state to provide medical care under medicaid and who agree to perform or advise women on medically necessary abortions (hereinafter "physician class"). The court then entered a temporary mandatory injunction in favor of the classes ordering the defendants to pay, under the medicaid program, for the costs of all therapeutic abortions whether or not the life of the woman was endangered by carrying the fetus to term.[9]

Pursuant to the court's order, the commissioner adopted Policy 173G which provides, in part, that effective October 9, 1981, the state will pay for abortions when the attending physician has certified "that the abortion is medically necessary for the patient's health."[10]

---

[9] Reference is made to the court's memorandum of decision dated October 9, 1981.

On November 30, 1984 an order of notice of the pendency of this action was directed to all indigent Connecticut women who qualify for medicaid, all physicians who are certified by the state to provide medical care under medicaid, all Connecticut town and city welfare officials and selectmen, and all hospitals, clinics and other medical facilities which are certified by the state to provide medically necessary abortions under medicaid. A certificate of compliance with the order of notice was filed on March 29, 1985.

[10] At the time this action was instituted, the limitation on medicaid abortions was merely a policy adopted by the commissioner. It was never adopted as a regulation in accordance with the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq. (hereinafter UAPA). In the temporary injunction the court ruled that policies such as 275 that define medicaid benefits come within the definition of a "regulation" and can only be promulgated in accordance with UAPA. The court, therefore, held that the regulation was void. *Persico* v. *Maher,* 191 Conn. 384, 456 A.2d 308 (1983). The test to determine if it is a regulation is whether the "rule has a substantial impact on the rights and obligations of parties who may appear before the agency in the future." *Salmon Brook Convalescent Home, Inc.* v. *Commission on Hospitals & Health Care,* 177 Conn. 356, 362, 417 A.2d 358 (1979). Thereafter, the legislature enacted Public Acts 1984, No. 84-150 (codified as part of General Statutes § 17-3f), in order to save the department of income maintenance from complete chaos because of the substantial numbers of policy statements which should have been adopted as regulations under UAPA and were not. Public Acts 1984, No. 84-150, provides in part: "All policy manuals of the department [of income maintenance], as they exist on [May 23, 1984], including the supporting bulletins but not includ-

## II

## SPECIAL DEFENSES

On October 9, 1981, the court also denied the defendants' motion to dismiss which challenged the court's jurisdiction. The same issues raised in the motion are included in the special defenses filed by the defendants. For those issues previously raised and ruled upon, the court affirms its decision of October 9, 1981, and incorporates its findings herein. In addition, the court will specifically, but in a summary manner, rule on each special defense.[11]

## A

### FIRST SPECIAL DEFENSE—SOVEREIGN IMMUNITY

The harsh doctrine of sovereign immunity was relaxed by the Connecticut Supreme Court in *Sentner*

---

ing statements concerning only the internal management of the department and not affecting private rights or procedures available to the public, shall be construed to have been adopted as regulations in accordance with the provisions of chapter 54 [UAPA]. . . ."

The plaintiffs, however, argue that as of October 9, 1981, Policy 275 was superseded by Policy 173 which authorizes (under 173.G) payment for all medically necessary abortions under the medicaid program and, therefore, Policy 275 was not validated but rather Policy 173.G. This argument has no merit. Policy 173.G was adopted by the commissioner solely to comply with the court's temporary mandatory injunction issued on October 9, 1981. It was not the policy of the commissioner, but merely written instruction for subordinates directing them to comply with the court order. At the time of the effective date of Public Acts 1984, No. 84-150, Policy 275 was and continues to be the policy of the commissioner, which was validated by the legislature as a regulation.

[11] The defendants also raise a seventh special defense addressed to the issue of attorney's fees. This issue was bifurcated and will be the subject of a subsequent trial.

In the eighth special defense, the defendants claim the issues are moot if the court accepts the plaintiff's argument that the regulation was not validated by Public Acts 1984, No. 84-150. This argument of the plaintiffs has been rejected; see footnote 10, supra; and, therefore, this special defense is moot.

v. *Board of Trustees,* 184 Conn. 339, 439 A.2d 1033 (1981). In *Sentner* the court held that the doctrine does not bar an action for declaratory judgment where the acts complained of are unconstitutional or unauthorized by statute. "In a constitutional democracy sovereign immunity must relax its bar when suits against government complain of unconstitutional acts." Id., 343. Since the present case is an action for declaratory judgment, the court has jurisdiction to grant the relief requested.

Furthermore, the aspect of this case that challenges the commissioner's adoption of the regulation as being ultra vires clearly is not subject to the defense of sovereign immunity. *Weaver* v. *Ives,* 152 Conn. 586, 590–91, 210 A.2d 661 (1965); see *Sentner* v. *Board of Trustees,* supra, 351 n.4 (*Healey, J.,* dissenting).

### B

#### SECOND SPECIAL DEFENSE—
#### EXHAUSTION OF ADMINISTRATIVE REMEDY

Although a party ordinarily must exhaust his or her administrative remedies; *Laurel Park, Inc.* v. *Pac,* 194 Conn. 677, 685, 485 A.2d 1272 (1984); there are several well recognized exceptions to the rule which apply to this case. First, and most important, the available administrative remedy is not adequate. In the present case time was of the essence. Every day that went by impaired the health of not only the named welfare recipient plaintiff but also the members of her class. In this instance, the plaintiff was able to obtain relief through an ex parte order of the court; members of her class were also given relief during the course of the years this complex case moved through the court at a snail's pace. Resort to the administrative remedy is not necessary when to do so "might . . . work severe harm on the party seeking relief." *Sharkey* v. *Stamford,* 196 Conn. 253, 257, 492 A.2d 171 (1985). "To deny declaratory relief on the ground of the existence of other reme-

dies, it must appear that the asserted remedies are not only available but that they are speedy and adequate and as appropriate as the requested relief." *Aaron* v. *Conservation Commission,* 178 Conn. 173, 179, 422 A.2d 290 (1979).

Moreover, the commissioner already had made it clear that it was his policy and that of the state to fund only those abortions that are necessary to preserve the life of the woman. The evidence is conclusive that Doe's medical condition did not require an abortion to preserve her life, but only to preserve her health.[12] Accordingly, the administrative remedy would have been futile and the plaintiff was not required to pursue it. *Kosinski* v. *Lawlor,* 177 Conn. 420, 424–25, 418 A.2d 66 (1979); *Bianco* v. *Darien,* 157 Conn. 548, 554, 254 A.2d 898 (1969); see *Sharkey* v. *Stamford,* supra. Furthermore, just as in *Friedson* v. *Westport,* 181 Conn. 230, 435 A.2d 17 (1980), the plaintiffs challenge the enactment of the regulation as ultra vires and unconstitutional. "Under these circumstances the statutory relief 'falls short of effectively, conveniently and directly determining whether the [plaintiff is] entitled to the relief claimed.' " Id., 233.

In regard to the plaintiff Holley, the defendants point to no administrative remedy that was available to him. For all the above reasons, there was no need for either plaintiff to pursue an administrative remedy.

---

[12] Holley, Doe's attending physician, was of the opinion (and this court finds) that although she required a medically necessary abortion, her condition was not life-threatening. Moreover, pursuant to the regulation, his decision is controlling. The regulation provides in part: "On the basis of his professional judgment, the attending physician has certified in writing that the abortion is necessary because the life of the mother would be endangered if the fetus were carried to term." Indeed, the defendants have conceded that the commissioner solely relies on and does not question the attending physician's judgment on this issue.

## C

### THIRD, FOURTH, FIFTH AND SIXTH SPECIAL DEFENSES— RES JUDICATA AND COLLATERAL ESTOPPEL

The defendants claim that the issues raised by the plaintiffs are barred under the principles of res judicata and or collateral estoppel. They argue that the state constitutional issues should have been raised in *Women's Health Case I.* The simple answer is that the federal court specifically reserved the state constitutional issues for the state courts.[13] If a court in the first action does not have jurisdiction, or having such jurisdiction, it declines to exercise that jurisdiction as a matter of discretion, then the second action is not precluded. 1 Restatement (Second), Judgments § 25, comment (e).

The defendants next claim that the dismissal by the court, *Fracasse, J.,* of *Women's Health Case II,* for failure to exhaust administrative remedies and for lack of standing, is also conclusive on the plaintiffs' claims in this suit. Although counsel representing the named plaintiffs in this case are the same as those who repre-

---

[13] "This court's decision today holds simply that, based on the decision of the Supreme Court, section 275 does not constitute a denial of equal protection under the United States Constitution, U.S. Const. amend. XIV. This holding does not, however, preclude a Connecticut court from determining that the regulation violates the equal protection clause of the Connecticut constitution, Art. first, sec. 20, or runs afoul of Connecticut statutory requirements. See, e.g., *Horton* v. *Meskill,* 172 Conn. 615, 639–51 [376 A.2d 359] (1977) (holding that Connecticut's school financing system violated Connecticut, though not federal, constitution); *Roundhouse Construction [Corporation]* v. *Telesco Masons Supply Co., Inc.,* 170 Conn. 155, 157–59, [365 A.2d 393,] cert. denied, 429 U.S. 889 [97 S. Ct. 246, 50 L. Ed. 2d 172] (1976) (determining on remand from U.S. Supreme Court that its earlier finding of a constitutional violation implicated both the Connecticut and federal constitutions). A decision based on a state constitution constitutes an adequate and independent state ground of decision which is immune from federal review. See *Minnesota* v. *National Tea Co.,* 309 U.S. 551 [60 S. Ct. 676, 84 L. Ed. 920] (1940)." *Women's Health Services, Inc.* v. *Maher,* slip op. at 12, n.6 (D. Conn., Dec. 16, 1980).

sented the plaintiffs in *Women's Health Case II*, the plaintiffs in each case are different parties. Furthermore, no class was certified in *Women's Health Case II*. It is beyond question that the doctrine of res judicata applies only when the same parties are involved in both actions—that is, there must be identity of parties. *State v. Ellis*, 197 Conn. 436, 463, 497 A.2d 974 (1985); *In re Juvenile Appeal (83-DE)*, 190 Conn. 310, 316, 460 A.2d 1277 (1983).

## D

### NINTH AND TENTH SPECIAL DEFENSES—STANDING

Finally, the defendants claim that the plaintiffs lack standing to pursue this matter. "Standing focuses on whether a party is the proper party to request adjudication of the issues, rather than on the substantive rights of the aggrieved parties. . . . It has long been recognized that a person is not 'entitled to set the machinery of the courts in operation except to obtain redress for an injury he has suffered or to prevent an injury he may suffer, either in an individual or a representative capacity. . . .' Standing is aptly described as 'a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests . . . .' " (Citations omitted.) *Nye v. Marcus*, 198 Conn. 138, 141–42, 502 A.2d 869 (1985).

To support their claim of lack of standing the defendants first claim that the named plaintiff Doe, given her circumstances, could have obtained an abortion on the basis that continued pregnancy for her was life-threatening. As previously indicated, the evidence does not support this claim.[14]

Furthermore, although the defendants initially raised the issue of standing, they did so without specifying

---

[14] See footnote 12, supra.

their reasons. Indeed, in its memorandum of decision in the initial motion to dismiss, the court stated the following: "The defendants cite no reason why these plaintiffs do not have standing; the defendants obviously attempt another broad sweep of the brush." Since then the court certified a class of poor women that must have standing by virtue of the class definition. It is further clear that the standing of the plaintiff Holley is not dependent upon that of the named plaintiff Doe. The issue of the physician's standing was decided by the Supreme Court of the United States in *Griswold* v. *Connecticut,* 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), a case involving the constitutionality of statutes that prohibited the sale of contraceptives or the distribution of information concerning their use. Justice Douglas, in writing for the majority, held that physicians had "standing to raise the constitutional right of the married people with whom they had a professional relationship. . . . The rights of husband and wife, pressed here, are likely to be diluted or adversely affected unless those rights are considered in a suit involving those who have this kind of confidential relation to them." Id., 481; *Singelton* v. *Wulff,* 428 U.S. 106, 118, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976).

In this case, both the plaintiffs and their respective classes have standing to seek adjudication of the validity of the regulation.

## III

### THE PLAINTIFF CLASS OF POOR WOMEN AND THEIR MEDICAL PROBLEMS

### "THE POOREST OF THE POOR"

The plaintiff class of women has been described as the "poorest of the poor."[15] They are women who,

---

[15] Dr. Frederick Naftolin, professor and chairman of the department of obstetrics and gynecology of Yale University School of Medicine, describes this class of women as the "poorest of the poor." Indeed, the department

because of either limited or no income, are eligible for Connecticut's medicaid program. Most are recipients of "Aid to Families with Dependent Children" (AFDC). General Statutes § 17-85 et seq. The income of this class of poor women is barely adequate to meet their basic needs and that of their children, which is 66 percent of the federal poverty level.[16] The AFDC grant does not include a cash allowance for medical care because these costs are paid directly to the medical providers under medicaid. The financial circumstances of the plaintiff class of poor women is aggravated by the AFDC flat grant for rent which is inadequate to cover the fair market value of rents. The commissioner concedes that it "is virtually impossible to find apartments which are affordable using the AFDC standard for rent."[17] He also admits that for "the majority of AFDC households, whose only cash income is their AFDC benefit check, the current standard is inadequate to either attain or maintain any decent living standard."[18]

Members of this class of poor women descriptively characterized their poverty at the time they sought an abortion. Rosie J. Doe No. 2[19] testified as follows: "I

of income maintenance has described them as "Connecticut's most vulnerable residents." As of June 30, 1984, approximately 64,000 women between the ages of 12 and 60 were eligible for medicaid in Connecticut.

[16] The following facts were admitted by the defendants: The federal poverty level of income is that income which is judged to be barely sufficient to meet the needs of a family; it varies depending on family size; it is adjusted each year by a factor usually based upon the consumer price index, one measure of the rate of inflation; and Connecticut's basic AFDC grant is generally set at about 66 percent of the federal poverty level.

[17] The defendants' admission of facts.

[18] The defendants' admission of facts.

[19] In addition to the named plaintiff Doe, three other members of the plaintiff class of poor women testified under pseudonyms in order to protect their privacy and are referred to as Rosie J. Doe Nos. 2, 3 and 4. The testimony of these four women was taken in chambers with only counsel and essential court personnel present. The court ordered the record of their identity sealed and a transcript of their testimony, with the deletion of names, was made available to the public by placing the same in the file.

had a piece of wood that I used on top of crates with a little table cloth over that and pillows around that, and that was my table. . . . I slept on a mattress. And my daughter slept on a used mattress that I got from a friend." Rosie J. Doe No. 3 explained she had to make diapers from rags because "diapers were very expensive" and she could not afford them. Rosie J. Doe No. 4 testified that she and her four children "were living in a one-room kitchenette efficiency" and "shared a community bathroom with three other tenants. . . . My four children and I lived, slept, ate in the same room." It took her longer to pay off the layaway on her eldest son's shoes than it took for her son's foot to grow to the next larger size. The abject poverty these women and their children are compelled to endure conclusively establishes that there is absolutely no fat in the AFDC grant that would enable a woman to skim enough from her budget for a medically necessary abortion. This is so even if time was not of the essence and a woman could pay for the abortion on a "layaway" plan.

The "poorest of the poor" also accurately describes the general health of these indigent women. Members of the class have significantly more medical problems than the general population as a result of their existence under poverty conditions. Therefore, they are likely to encounter significantly more medical problems as a result of their pregnancies which may not necessarily be life-threatening but for which a medically necessary abortion may be indicated.

Expert witnesses testified[20] as follows regarding those medical conditions that may require an abortion:

[20] The plaintiffs' experts, who testified on the multitude of medical problems, both physical and psychological, which justified a therapeutic abortion and the devastating effect that pregnancy has upon these poor women, were: Dr. Marshall Rud Holley, assistant clinical professor of obstetrics and gynecology, Yale University, and practicing physician of obstetrics and

There are many pre-existing medical conditions that are aggravated by pregnancy. These include cardiovascular problems, gastrointestinal problems, renal disorders, degenerative nerve diseases, lung diseases, diabetes, anemia, phlebitis, asthma, malnutrition, urinary tract infections, medical problems associated with prior pregnancies, medical conditions and risks related to the youth of the pregnant female (such as inadequate development of the pelvis), medical conditions and risks related to advanced age of the pregnant female, autoimmune diseases, cancer, adjustment disorder, psychotic illness, mental retardation, depression and personality disorders.

Even if the pregnancy itself does not aggravate the condition, it may make treatment of the condition difficult, if not impossible. For example, chemotherapy or radiation treatment for certain malignancies may be contraindicated if a fetus is to be carried to term. Pregnancy also makes it difficult to treat women with asthma and psychiatric disorders.

Pregnancy can also interfere with and hamper a diagnosis, as was the case with Doe's conization. Another

gynecology (plaintiff); Dr. David Bingham, chief of department of obstetrics and gynecology, Backus Hospital, and Director, Planned Parenthood Out-Patient Abortion Clinic of Norwich; H. Ann McLendon, health educator, Hartford Area Health Education Center; Dr. Frances M. Baker, assistant professor, department of psychiatry, Yale University, and director, psychiatric services in emergency room, Yale-New Haven Hospital; Dr. Joan Griggs Babbott, executive director of Planned Parenthood League of Connecticut; Dr. Victor C. Strasburger, director of adolescent medicine and associate professor of pediatrics, Yale University and University of Connecticut; Dr. Ellen Frank, associate professor of psychiatry and psychology, University of Pittsburgh School of Medicine; Dr. Barbara Fibel, assistant professor, department of psychiatry, Cornell University Medical College and Yale School of Medicine; Dr. Frederick Naftolin, professor and chairman, department of obstetrics and gynecology, Yale School of Medicine, and chief, department of obstetrics and gynecology, Yale-New Haven Hospital.

example is where a woman requires an x-ray as a diagnostic procedure to determine whether her health is at risk for some other reason.

Finally, some pregnancies have a profound effect upon women which materially affect their physical and mental health, but are not life-threatening, such as pregnancies which are a result of rape and incest.

To be sure, some of the foregoing conditions which, at the beginning of the pregnancy pose only a threat to the woman's health, could result, if she continues on with the pregnancy, in severe permanent damage or even death. A condition that begins as merely a medical problem could evolve into a situation that imperils her life. By the time this threat to life is discovered it may be too late; her condition may have deteriorated beyond repair. Furthermore, the abortion procedure itself, when performed in the advanced stages of pregnancy, can be life-threatening.

In sum, it has been made abundantly clear that some pregnancies, although not reaching the level of threatening the woman's life, could have a devastating effect upon her physical and psychological health.

## IV

### THE PHYSICIAN CLASS

The physician class is composed of the doctors who treat the poor and are willing to perform or advise on medically necessary abortions. Physicians are charged with the responsibility of furnishing medical advice to their patients in order to help preserve their health. The relationship between the patient and physician is a unique one protected by professional standards. Constraints on this relationship that jeopardize the health of the woman are alien and antithetical to the practice of medicine.

## V

### STATUTORY REQUIREMENT FOR FUNDING OF THERAPEUTIC ABORTIONS

The plaintiffs' complaint seeking to compel the state to pay under its medicaid program for therapeutic abortions is based upon statutory and constitutional grounds. The court will first consider the statutory grounds.

The plaintiffs' claim that the regulation is invalid because it is inconsistent with § 17-134b of the General Statutes which provides in part: "Medical assistance shall be provided for any otherwise eligible person whose income . . . is not more than the minimum income permissible under federal law for such eligibility . . . ." The court agrees with the plaintiffs that the regulation exceeds the commissioner's statutory authority as prescribed in § 17-134b.

Section 17-134b clearly provides that medical assistance "shall" be provided. "The use of word 'shall' in the statute connotes that the performance of the statutory requirements is mandatory rather than permissive." *Thornton Real Estate, Inc.* v. *Lobdell,* 184 Conn. 228, 230, 439 A.2d 946 (1981). The legislature did not provide for any exceptions to this mandate. It is apparent that the commissioner also attached to the statute the same construction. The commissioner adopted formal regulations implementing § 17-134b which provide that the state must pay for all services which are medically necessary for an eligible person, including those "which are deemed by the department to be necessary for the prevention, diagnosis and treatment of illness, disease, injury or infirmity, the promotion and the maintenance of physical and mental health, and the rehabilitation after illness or injury . . . ." Regs., Conn. State Agencies § 17-134d-1 (1). Section 17-134d-2

of the regulations, which lists the medical and other
care that the state is required to provide, includes every
conceivable nonexperimental medical service.[21]

This construction of § 17-134b requiring the state to
pay, under the medicaid program, for medically neces-
sary abortions finds strong support in the unbroken 350
years of statutory laws and public policy of the state
of Connecticut of paying for all necessary medical
expenses for the poor. From 1650, the year of the earli-
est recorded code of our state, to the present, the
state's legislative bodies have directed that the colony,
the state and or their political subdivisions pay for the
medical care of the indigent.[22] Christopher Collier, a
professor and historian for the state of Connecticut,
who was called as an expert, summarized the state's
rich history of caring for the medical needs of the poor
as follows: "[W]e have a continuous unbroken tradi-
tion in Connecticut dating from the middle of the seven-
teenth century right down to the present that the public
will be responsible for all medical care and other needs

[21] Furthermore, the conclusion that § 17-134b requires the state to fund
medically necessary abortions for this class of poor women is clearly con-
sistent with the commissioner's goals under medicaid. He admits that there
is a medical need for certain abortions that do not reach a life-threatening
level. The commissioner also concedes that providing such a medical ser-
vice contributes to the goals of medicaid which is to "provide a broad array
of medical services so that . . . [the Commissioner] is meeting the basic
health care needs of [the] citizens." The defendants' admission of facts.

[22] See, e.g., Code of 1650 of the General Court p. 80; Book of the Gen-
eral Laws (1672) p. 57; Acts and Laws of his Majesty's Colony of Connect-
icut (1702) pp. 94–95; Acts and Laws of the State of Connecticut (1784)
pp. 193, 228–29; Statutes (1808 Rev.) tit. CXXX; Statutes (1821 Rev.) tits.
65, 73; Statutes (1838) tit. LII, chs. II, III; Statutes (1849 Rev.) tit. XLII,
§§ 13 through 31; Statutes (1854) tit. XLII, §§ 13 through 30; General Stat-
utes (1866 Rev.) tit. L; General Statutes (1888 Rev.) §§ 3295 through 3319;
General Statutes (1902 Rev.) §§ 2476 through 2500; General Statutes (1918
Rev.) §§ 1623 through 1629; General Statutes (1930 Rev.) §§ 1693 through
1698, esp. §§ 1695, 1710 through 1716; General Statutes (1949 Rev.) §§ 2574
through 2586, 2603, esp. § 2586; General Statutes (1955 Sup.) §§ 1426d
through 1434d.

of [the] poor in the state of Connecticut . . . . Right from the start the care was to be fully supported by the public."[23]

Two tenets emerge from this distinguished history of paying for the medical expense of the poor from the public purse. First, the state or its political subdivisions must fund all medically necessary services for the poor.[24] Second, the attending physician is the one who determines the nature and extent of the medical care provided at public expense based upon the medical needs of the indigent person[25] (pursuant, of course, to such reasonable regulations as are required for the efficient administration of this vast program).

Statutes must be examined in the light of their historical development and legislative evolution. *Penfield* v. *Jarvis,* 175 Conn. 463, 466, 399 A.2d 1280 (1978); *Rivera* v. *I. S. Spencer's Sons, Inc.,* 154 Conn. 162, 164–65, 223 A.2d 808 (1966). "In the interpretation of a statute, a radical departure from an established policy cannot be implied. It must be expressed in unequivocal language." *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 667, 103 A.2d 535 (1954). Since § 17-134b does not exempt any particular medical procedure or service, it must be read in the manner which

---

[23] Connecticut's tradition of caring for the indigent was wholly public rather than private or mixed public and private. "It is the duty of every government to protect and to provide for the poor . . . ." I Root XXVIII (1789–1793).

[24] Collier testified as follows: "That it has been over three hundred and fifty years time in which the public assumed responsibility for the indigent ill who have no family legally responsible for them who can in fact take care of them. And that similarly anyone coming into the state of Connecticut can expect fully to have his needs taken care if should he fall on hard times."

[25] Collier answered the question as to who determined the medical treatment to be provided as follows: "The statutes indicate that all necessary medical aid was to be paid for. And there is no indication that anyone made any judgments about what was necessary medical aid other than the physician."

is consistent with the long established public policy of this state of providing for all necessary medical services.

The defendants argue, however, that § 17-134b of the General Statutes requires that the state's medicaid program mirror the federal program and thus the commissioner is mandated to provide only those medical services that are eligible for partial reimbursement by the federal program. Since the Hyde amendment restricts federal reimbursement to only those abortions necessary to preserve the life of the woman, the commissioner claims he is likewise required to limit the Connecticut program. The defendants offer in support of this claim an argument that is similar to that which they advanced in *Persico* v. *Maher,* 191 Conn. 384, 465 A.2d 308 (1983). In *Persico* they claimed that regulations under the medicaid program need not be adopted under UAPA because the department of income maintenance "is not a state agency in this regard, but an agent of the federal government in administering the national Medicaid program locally"; the Supreme Court rejected this argument, labelling it "unusual." Id., 405.

Section 17-134a does provide that the commissioner "is authorized to take advantage of the medical assistance programs provided in Title XIX, entitled 'Grants to States for Medical Assistance Programs,' contained in the Social Security Amendments of 1965 and may administer the same in accordance with the requirements provided therein . . . ." This, however, refers to *administering* the program in such a manner that the state is eligible for available federal reimbursement; § 17-134a cannot be construed to mean anything more or less than this. *Persico* makes it clear that § 17-134a authorizes the commissioner "to accept federal medicaid grants and administer [the grants] in accordance with the federal requirements." *Persico* v. *Maher,* supra, 405. Yet it is certain the state has its own med-

icaid program to administer and the commissioner must adopt regulations consistent with the statutes of the state of Connecticut. General Statutes § 17-134d. Surely, the state is free to include in its program medically necessary abortions, whether or not it is subject to federal reimbursement. *Harris* v. *McRae,* supra, 311 n.16. Federal law merely sets the minimum which the state must provide. *Persico* v. *Maher,* supra, 392.

The defendants also argue that the phrase "otherwise eligible" in § 17-134b requires that the medical services be eligible for federal reimbursement. This construction would require the court to layer a requirement that is not there. "Courts cannot, by construction, read into statutes provisions which are not clearly stated." *Houston* v. *Warden,* 169 Conn. 247, 251, 363 A.2d 121 (1975); *Johnson* v. *Manson,* 196 Conn. 309, 314, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063, 106 S. Ct. 813, 88 L. Ed. 2d 787 (1986). If this is what the legislature intended, it should have made it explicit. *Gomeau* v. *Forrest,* 176 Conn. 523, 526-27, 409 A.2d 1006 (1979). The phrase "otherwise eligible" has obvious reference to whether the person is categorically and financially eligible; see *Persico* v. *Maher,* supra, 396; neither of these requirements are at issue in this case.

Finally, since § 17-134b is remedial, it must be given a liberal construction in favor of providing all necessary medical services for the indigent. Id., 395. "Remedial statutes are to be liberally construed in favor of those whom the legislature intended to benefit." *Hinchliffe* v. *American Motors Corporation,* 184 Conn. 607, 615 n.4, 440 A.2d 810 (1981).

The commissioner may adopt only those regulations that are within his statutory authority. "An administrative agency, in making rules and regulations, must act within its statutory authority, within constitutional

limitations, and in a lawful and reasonable manner."
*Page* v. *Welfare Commissioner,* 170 Conn. 258, 262, 365
A.2d 1118 (1976). Likewise, [n]o administrative or
regulatory body can modify, abridge or otherwise
change the statutory provisions under which it acquires
authority unless the statute specifically grants it that
power." *State ex rel. Huntington* v. *McNulty,* 151 Conn.
447, 449, 199 A.2d 5 (1964); *Lundy Electronics & Sys-
tems, Inc.* v. *Tax Commissioner,* 189 Conn. 690, 695,
458 A.2d 387 (1983). It is clear that the legislature has
made no exceptions to the medicaid program and the
commissioner is not at liberty to do so. The court con-
cludes that the commissioner's adoption of the regula-
tion which prohibits funding for abortions except when
the woman's life is threatened was not authorized under
the provisions of § 17-134b.

Decisions of jurisdictions are in accord with this
finding. *Planned Parenthood Assn.* v. *Department of
Human Resources,* 297 Or. 562, 687 P.2d 785 (1984);
see *Dodge* v. *Department of Social Services,* 198 Colo.
379, 600 P.2d 70 (1979), after remand, 657 P.2d 969
(Colo. App. 1982); *Stopczynski* v. *Governor,* 92 Mich.
App. 191, 285 N.W.2d 62 (1979).

## VI

### Constitutional Adjudication

The plaintiffs also seek to have the regulation invali-
dated on state constitutional grounds.[26] Ordinarily, the
court's inquiry would stop with the finding that the
defendants have no authority under the statutes to deny
funding for medically necessary abortions for this class
of poor women. Deciding the case on statutory claims
enables the court to effectively dispose of the contro-
versy without adjudicating difficult and sensitive con-
stitutional issues. *Maloney* v. *Pac,* 183 Conn. 313, 324,

---

[26] See footnote 29, infra.

439 A.2d 349 (1981); *Hartford* v. *Powers,* 183 Conn. 76, 84–85, 438 A.2d 824 (1981); *Pepin* v. *Danbury,* 171 Conn. 74, 88, 368 A.2d 88 (1976). "Appropriate deference to a coordinate branch of government exercising its essential functions demands that . . . [the court] refrain from deciding constitutional challenges to its enactments until the need to do so is plainly evident." *State* v. *Madera,* 198 Conn. 92, 105, 503 A.2d 136 (1985). Indeed, it "is a 'fundamental rule of judicial restraint.' " *Jean* v. *Nelson,* 472 U.S. 846, 854, 105 S. Ct. 2992, 86 L. Ed. 2d 664 (1985).

There are, however, several exceptions to this general rule which are applicable in this case. First, the constitutional review the plaintiffs seek is of a mere regulation which was not even formally adopted under the scrutiny of the legislature,[27] but only validated through saving legislation together with hundreds of other policies adopted by the commissioner.[28] Since it does not require invalidation of a legislative enactment, this rule of abstention should be relaxed. *State* v. *Madera,* supra, 108–109.

Second, this case raises important issues of great public concern and the court would be remiss in its duty if it did not address them. *Green* v. *State,* 166 So. 2d 585, 587 (Fla. 1964); *State* v. *Campbell,* 75 N.M. 86, 92, 400 P.2d 956 (1965). So in *Cyphers* v. *Allyn,* 142 Conn. 699, 702, 118 A.2d 318 (1955), the Supreme Court entertained the constitutional argument because the case presented questions of "public interest" even though the plaintiff may have had no standing. See *State* v. *Sul,* 146 Conn. 78, 83, 147 A.2d 687 (1958). The real issue in this case is whether the prohibition of funding medically necessary abortions under Connecticut's medicaid program—be it by policy, regulation

[27] Conn. Const., art. II (as amended by art. XVIII); General Statutes § 4-168 et seq.

[28] See footnote 10, supra.

or statute—meets state constitutional standards, and that issue should be answered. See *Yoo* v. *Moynihan,* 28 Conn. Sup. 375, 378, 262 A.2d 814 (1969).

Third, a decision grounded solely on a regulation exceeding statutory authority may well bring about statutory change. The legislature is entitled to guidance. This agonizing issue, which affects the health and life of thousands of poor women, must be put to rest on constitutional grounds. See *Lightfoot* v. *Walker,* 486 F. Sup. 504, 508–509 (S.D. Ill. 1980).

Finally, in order for the court to determine whether the plaintiffs are entitled to attorney's fees incurred on behalf of the class of poor women, it must determine if the defendants violated their constitutional right. The plaintiffs clearly would not be entitled to attorney's fees on the sole basis that the defendants exceeded their statutory authority.

## VII

### Substantive Due Process of Law

The plaintiffs first raise the claim that their due process rights are violated because the regulation impinges on their right of privacy guaranteed by the state constitution. Although proceeding on state grounds,[29] the

---

[29] The plaintiffs raise only state constitutional grounds to invalidate the regulation. In making these determinations, the court must interpret our state constitution independently of the United States constitution when required by its text, history, tradition and intent. *State* v. *Kimbro,* 197 Conn. 219, 234–35, 496 A.2d 498 (1985); *Horton* v. *Meskill,* 195 Conn. 24, 35, 469 A.2d 1099 (1985); Williams, "In the Supreme Court's Shadow: Legitimacy of State Rejection of Supreme Court Reasoning and Result," 35 S.C.L. Rev. 353 (1984); see generally Special Section: The Connecticut Constitution, 15 Conn. L. Rev. 7 (1982). It is clear that the federal constitution merely establishes a minimum national standard for the exercise of individual liberties and rights. *Pruneyard Shopping Center* v. *Robins,* 447 U.S. 74, 80–81, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980); *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984). Nevertheless, the underpinnings of any such decision must rest on independent and adequate state grounds.

court is not precluded from the use of federal precedent in the formulation of state constitutional law. "Just as it is wrong to assume that state constitutions are mere mirror images of the federal constitution, so it is wrong to assume that independent state constitutions share no principles with their federal counterpart. The interstices of open-ended state constitutions remain to be filled, and many of them will best be filled by adopting into state law, on a case-by-case basis, persuasive constitutional doctrines from federal law and from sister states." Peters, "State Constitutional Law: Federalism in the Common Law Tradition," 84 Mich. L. Rev. 583 (1986). For example, the reasoning that has led the Supreme Court of the United States to hold that implicit in the liberty clause of the fourteenth amendment is that the guaranty of certain fundamental rights may have equal applicability in establishing implicit rights afforded by our state constitution. See, e.g., *Frazier* v. *Manson,* 176 Conn. 638, 646, 410 A.2d 475 (1979). It is clear, however, that the federal decisional law is not a lid on the protections guaranteed under our state constitution. "[D]ecisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." *Horton* v. *Meskill,* 172 Conn. 615, 642, 376 A.2d 359 (1977).

*Michigan* v. *Long,* 463 U.S. 1032, 1041, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); see *State* v. *Cohane,* 193 Conn. 474, 498 n.19, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); *State* v. *Ferrell,* 191 Conn. 37, 45 n.12, 463 A.2d 573 (1983); Utter, "Swimming in the Jaws of the Crocodile; State Court Comment on Federal Constitutional Issues when Disposing of Cases on State Constitutional Grounds," 63 Texas L. Rev. 1025 (1985); Greenhalgh, "Independent and Adequate State Grounds: The Long and the Short of It," (published in McGraw, Developments in State Constitutional Law (1985) pp. 222–34).

In 1973, the United States Supreme Court held in *Roe* v. *Wade,* supra, that the constitutional right to privacy encompasses a woman's decision whether or not to terminate her pregnancy. Justice Blackmun, writing the majority opinion for six justices, held that although the constitution does not explicitly mention the right of privacy, it is protected as fundamental and " 'implicit in the concept of ordered liberty.' " Id., 152. The court in *Roe* pointed out that this right to decide whether or not to terminate a pregnancy has its roots in a line of previous cases relating to marriage, procreation, contraception, family relationships, child rearing and education. Id., 152–53.[30] "This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." Id., 153. This right to terminate the pregnancy coexists with the right of a person to preserve and protect their body. See *Harris* v. *McRae,* supra, 316. Any question about this federal constitutional right was put to

---

[30] For example, in the 1965 landmark case of *Griswold* v. *Connecticut,* 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), the Supreme Court of the United States struck down a Connecticut law forbidding the use of contraceptives. The decision was based upon the fundamental right of privacy, which the Supreme Court held to be implicit in our federal constitution and protected by the due process clause of the fourteenth amendment. In reasoning that such laws were unconstitutional, Justice Douglas asked the following rhetorical question: "Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the marriage relationship." Id., 484–86. Although there was obvious disagreement among the justices as to the source of the constitutional right, *Griswold* articulated in clear language the right of privacy that is guaranteed by the constitution. See also *Eisenstadt* v. *Baird,* 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972); *Pierce* v. *Society of Sisters,* 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); *Meyer* v. *Nebraska,* 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923).

rest when the court reaffirmed its holding in *Roe* v. *Wade* in *Akron* v. *Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 419, 103 S. Ct. 2481, 76 L. Ed. 2d 687 (1983).

Moreover, the constitutional protection of privacy extends to the right of the woman and her physician to make decisions about her health and for the physician "to administer medical treatment according to his professional judgment up to the points where important state interests provide compelling justifications for intervention. Up to these points, the abortion decision in all its aspects is inherently, and primarily, a medical decision, and basic responsibility for it must rest with the physician." *Roe* v. *Wade,* supra, 165–66. "The court . . . has recognized, because abortion is a medical procedure, that the full vindication of the woman's fundamental right necessarily requires that her physician be given 'the room he needs to make his best medical judgment.' *Doe* v. *Bolton,* 410 U.S. 179, 192 [93 S. Ct. 739, 35 L. Ed. 2d 201, reh. denied, 410 U.S. 959, 93 S. Ct. 1410, 35 L. Ed. 2d 694] (1973). The physician's exercise of this medical judgment encompasses both assisting the woman in the decision making process and implementing her decision should she choose abortion." (Citations omitted.) *Akron* v. *Akron Center for Reproductive Health, Inc.,* supra, 427.

The setting which led to the state's first formal constitution of 1818 compels the conclusion that the right of privacy is also implicitly guaranteed under our state charter of liberty. The constitution of 1818 not only limited the power of government, but also guaranteed to the people of this state liberty and secured for them fundamental rights. It protected "individual liberties against infringement by government." *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 61, 469 A.2d 1201 (1984). The provisions of the constitution ensure our citizens that no branch of government, not even the

legislature (which prior thereto had inclusive power), could encroach upon these fundamental rights except for the most compelling reasons. *State* v. *Coleman,* 96 Conn. 190, 192, 113 A. 385 (1921).

Some of these fundamental rights were explicitly stated in the declaration of rights, and others were implied. These latter rights are recognized in the preamble of the constitution and that of the declaration of rights; and all are guaranteed by the due process clause. These clauses, first incorporated in the constitution of 1818, were carried forward in their original language through several revisions to the present constitution of 1965. The preamble of the constitution makes clear that it reserves to the people "the liberties, rights and privileges which they have derived from their ancestors"; and the preface clause to the declaration of rights, article first, broadly incorporates the concept of ordered liberty by stating "[t]hat the great and essential principles of liberty and free government may be recognized and established . . ." which clause is followed by a declaration of specific rights. Section 10 of article first, the due process clause,[31] provides that "every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law . . . ."

The framers of our state constitution, like those of the federal constitution, when drafting these clauses had in mind those fundamental rights, sometimes referred to as "natural rights," which the people took for granted as being deeply rooted in the core of liberty.[32] Justice Zephaniah Swift, who was instrumen-

---

[31] There are two due process clauses in article first. Section 8 is generally applied to criminal matters and § 10 to civil matters.

[32] It has been "insisted that an intense and widely shared adherence to natural rights ideas by the Constitution's framers led them to neglect more specific mention of rights deemed too obvious to require elaboration." L. Tribe, American Constitutional Law (1978) § 15-3, p. 894; Antieau, Modern Con-

tal in the drafting and adoption of the constitution of 1818, recognized and defended natural rights as follows: "Natural rights consist in the enjoyment and exercise of a power to do as we think proper, without any other restraint than what results from the law of nature, or what may be denominated the moral law . . . ." 1 Swift, Digest (1822) c. 1., p. 15; Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 94–97 (1982). To be sure, the Connecticut Supreme Court in early decisions has recognized this. Our Supreme Court has held that the legislature "cannot entirely disregard the fundamental principles of the social compact. Those principles underlie all legislation, irrespective of constitutional restraints, and if the act in question is a clear violation of them, it is our duty to hold it abortive and void." *Welch* v. *Wadsworth,* 30 Conn. 149, 155 (1861); *Camp* v. *Rogers,* 44 Conn. 291, 296–97 (1877) ("natural justice"); *Booth* v. *Woodbury,* 32 Conn. 118, 127 (1864) ("principles of natural justice"); *Goshen* v. *Stonington,* 4 Conn. 209, 225 (1822) ("vested rights").

stitutional Law (1969) § 15-44. "The notion that governmental authority has implied limits which preserve private autonomy predates the establishment of the American Republic. During the 17th and 18th centuries, there evolved an American tradition of 'natural law,' postulating that 'certain principles of right and justice . . . are entitled to prevail of their own intrinsic excellence." Tribe, supra, § 8-1, p. 427.

Although determination of fundamental rights protected by the federal constitution currently does not usually involve natural right analysis or debate; Tribe, supra, p. 894; the doctrine is very significant historically in understanding the thinking of the framers when determining whether rights are implicit under the state constitution. Probably, natural right analysis came into disfavor because of its conservative application during the early part of the century in striking down progressive legislation which today would certainly be upheld as being within the legitimate police powers of the state. See, e.g., *Lochner* v. *New York,* 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905) (ultra-conservative application of the right to contract under the liberty clause. The court held that state legislation which prohibited a person from working in a bakery more than sixty hours in a week or ten hours a day was unconstitutional.).

Indeed, the Supreme Court of Connecticut in 1895 made it clear that there are implicit fundamental rights protected by the state constitution. In speaking of our state declaration of rights, the court held: "It is patent that not everything that can be called a right is included in this guaranty. The protected rights are those that inhere in 'the great and essential principles of liberty and free government' recognized in the course of events that resulted in our independence, and established by the adoption of our Constitution. The language used is purposely broad . . . ." *State* v. *Conlon,* 65 Conn. 478, 489, 33 A. 519 (1895). And these rights are protected through the due process clause. *Camp* v. *Rogers,* supra, 297. "In determining which rights are fundamental, judges are not left at large to decide cases in light of their personal and private notions. Rather, they must look to the 'traditions and [collective] conscience of our people' to determine whether a principle is 'so rooted [there] . . . as to be ranked as fundamental.' *Snyder* v. *Massachusetts,* 291 U.S. 97, 105 [54 S. Ct. 330, 78 L. Ed. 674 (1934)]. The inquiry is whether a right involved 'is of such a character that it cannot be denied without violating those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" . . . .' *Powell* v. *Alabama,* 287 U.S. 45, 67 [53 S. Ct. 55, 77 L. Ed. 158 (1932)]. 'Liberty' also 'gains content from the emanations of . . . specific [constitutional] guarantees' and 'from experience with the requirements of a free society.' *Poe* v. *Ullman,* 367 U.S. 497, 517 [81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961)] (dissenting opinion of Mr. Justice Douglas)." *Griswold* v. *Connecticut,* supra, 493–94 (Goldberg, J., concurring).

The right to be let alone is fundamental. Justice Brandeis, in his dissent in *Olmstead* v. *United States,* 277 U.S. 438, 478, 48 S. Ct. 564, 72 L. Ed. 944 (1928), put it quite well when he wrote: "The makers of our

Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure, and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, *the right to be let alone*—the most comprehensive of rights and the right most valued by civilized men." (Emphasis added.) This right to privacy is older than the Bill of Rights. *Griswold* v. *Connecticut,* supra, 486.

It is absolutely clear that the right of privacy is implicit in Connecticut's ordered liberty.[33] *State* v. *Butkus,* 37 Conn. Sup. 515, 517, 424 A.2d 659 (1980); *State* v. *Allen,* 37 Conn. Sup. 506, 513, 424 A.2d 651 (1980). The Connecticut Supreme Court has recognized that aspect of privacy which includes procreative choice as a fundamental right. See *Frazier* v. *Manson,* supra, 646. And more recently, the Supreme Court of Connecticut again recognized the right of privacy in *Ochs* v. *Borrelli,* 187 Conn. 253, 258, 445 A.2d 883 (1982). See *Foody* v. *Manchester Memorial Hospital,* 40 Conn. Sup. 127, 132, 482 A.2d 713 (1984).

---

[33] The plaintiffs also argue that the class of poor women have an implicit fundamental right to appropriate medical treatment including a medically necessary abortion protected by the Connecticut constitution. The argument is predicated on the unbroken 350 years of statutory laws of our state and its predecessor governments which have mandated publicly funded appropriate medical care for the poor. See part V, supra. Certain long established rights are "viewed as fundamental, although . . . [they are] statutory rather than constitutional." *D'Amico* v. *Manson,* 193 Conn. 144, 147, 481 A.2d 1084 (1984); See *Gaines* v. *Manson,* 194 Conn. 510, 516, 476 A.2d 543 (1984); *Horton* v. *Meskill,* 172 Conn. 615, 647, 376 A.2d 359 (1972). Of course, if the right to such medical care reached the level of being fundamental, and based upon the overwhelming weight of evidence that an abortion is the only appropriate medical treatment for these women (which was not contested by the defendant), failure to fund such medically necessary abortions would clearly and explicitly impinge on this constitutional right. The court, however, is not required to decide this issue in this case.

Surely, the state constitutional right to privacy includes a woman's guaranty of freedom of procreative choice. "The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices. That decision holds a particularly important place in the history of the right of privacy, a right first explicitly recognized in an opinion holding unconstitutional a statute prohibiting the use of contraceptives . . . and most prominently vindicated in recent years in the context of contraception . . . and abortion. This is understandable, for in a field that by definition concerns the most intimate of human activities and relationships, decisions whether to accomplish or to prevent conception are among the most private and sensitive. 'If the right of privacy means anything, it is the right of the individual, married or single, to be free of unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.' " (Citations omitted.) *Carey* v. *Population Services International,* 431 U.S. 678, 685, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1977); see also L. Tribe, American Constitutional Law (1978) § 15-10, p. 924; L. Tribe, Constitutional Choices (1985) pp. 243–45.

This right to privacy also encompasses the doctor-patient relationship regarding the woman's health, including the physician's right to advise the woman on the abortion decision based upon her well-being. *Roe* v. *Wade,* supra, 166. Finally, the right to make decisions which are necessary for the preservation and protection of one's health, if not covered within the realm of privacy, stands in a separate category as a fundamental right protected by the state constitution. This point is made clear in *Roe* v. *Wade* wherein it was held that at *any stage* of the pregnancy the woman's health is paramount. *Harris* v. *McRae,* supra, 316.

It must next be determined whether the regulation impinges on these three fundamental rights of privacy —the right to secure an abortion, the right to preserve one's health, and the right to maintain the patient-physician relationship. In the face of a fundamental right protected by the constitution, the state must maintain its neutrality unless an intrusion is justified by a compelling state interest. "It is well settled that, quite apart from the guarantee of equal protection, if a law 'impinges upon a fundamental right explicitly or implicitly secured by the Constitution [it] is presumptively unconstitutional.' *Mobile* v. *Bolden,* 446 U.S. 55, 76 [100 S. Ct. 1490, 64 L. Ed. 2d 47 (1980)] (plurality opinion)." *Harris* v. *McRae,* supra, 312.

Even if the state is not obligated to pay for medical expenses of an indigent person, "when a State decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations." *Maher* v. *Roe,* 432 U.S. 464, 469–70, 97 S. Ct. 2376, 53 L. Ed. 2d 484 (1977). The plaintiffs here do not argue that the state is required to pay for nontherapeutic abortions; their claim is simply that as long as the state has decided to pay for all other medical expenses for the poor, it must also pay for medically necessary abortions.

The United States Supreme Court in *McRae* ruled on the constitutionality of the Hyde amendment which allowed medical reimbursement to the states for the termination of only those pregnancies that were life-threatening or a result of rape or incest. In *McRae,* a bare bones majority of the Supreme Court (five to four) held that the Hyde amendment did not contravene the liberty guaranties of the due process clause of the fifth amendment to the United States constitution. On the same day, the same slim majority in *Williams* v. *Zbaraz,* supra, upheld the constitutionality of an Illinios statute which prohibited state medical assistance

payments for all abortions except those necessary for the preservation of the life of the woman. The *McRae* majority held that "although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency." *Harris* v. *McRae,* supra, 316.

This court is unable to reconcile the mandate and logic of the United States Supreme Court in *Roe* v. *Wade,* (to which at least eight of the justices of the Supreme Court adhered as of the date *McRae* was decided) with the *McRae* and *Zbaraz* decisions. Medicaid reimbursement funds are made available for all the health care costs of women, including these medical costs necessary to carry the fetus to term, but not for the medically necessary abortion.[34] Surely, this constitutes infringement on the right to an abortion. The United States Supreme Court has consistently held that even though there is no constitutional right to benefits, the state cannot extend or refuse to extend them on a constitutionally impermissible basis. See, e.g., *Memorial Hospital* v. *Maricopa County,* 415 U.S. 250, 94 S. Ct. 1076, 39 L. Ed. 2d 306 (1974) (durational residence requirement for medical benefits infringed on right to travel); *Healy* v. *James,* 408 U.S. 169, 92 S. Ct. 2338, 33 L. Ed. 2d 266 (1972) (refusal to recognize a group by a state college infringed on freedom of association); Cox, "The Supreme Court, 1979 Term," 94 Harv. L. Rev. 1, 99 (1980). "Freedoms such as these

---

[34] Indeed, the state's cost for providing comprehensive maternity and childbirth care is significantly more than the costs of an abortion. As of March, 1985, these medical costs for childbearing increased to $3149.65 and the cost of a first trimester abortion was about $175.

are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates* v. *Little Rock*, 361 U.S. 516, 523, 80 S. Ct. 412, 4 L. Ed. 2d 480 (1960).

Since we are proceeding solely under the state constitution, *McRae* and *Zbaraz* are not controlling. As previously indicated in this decision, the court must look to state law. In construing our state charter or liberties, we must put to rest "the notion that state constitutional provisions were adopted to mirror the federal Bill of Rights. . . ." Brennan, "State Constitutions and the Protection of Individual Rights," 90 Harv. L. Rev. 489, 501 (1977); Margulies, "A Lawyer's View of the Connecticut Constitution," 15 Conn. L.J. 107, 119 (1982). "We are . . . free, in appropriate circumstances, to follow a different route and thus to recognize that the Connecticut constitution may provide for the people of this state greater rights and liberties than they are afforded under the federal constitution." *State* v. *Fleming*, 198 Conn. 255, 261, 502 A.2d 886 (1986). And it is clear that the "due process clause of the Connecticut constitution shares *but is not limited* by the content of its federal counterpart." (Emphasis added.) *Fasulo* v. *Arafeh*, 173 Conn. 473, 475, 378 A.2d 553 (1977).

In the present case, even though the poverty of the plaintiff women was not of the state's making and there may have been no constitutional obligation to pay for the medical treatment of the poor,[35] once the state has chosen to do so it must preserve neutrality. In making this determination, it therefore becomes important to review the purposes and goals of medicaid—the state's medical treatment program for the poor. The primary goals of medicaid are to promote the health of the indigent by providing them with all the "health services

---

[35] But see footnote 33, supra.

and medical supplies necessary to prevent or treat illness or injury . . . ."[36] Not only does the program provide that this medical care be "adequate" but also it must be of a "quality that does not penalize them for being poor."[37] To be sure, the Connecticut medicaid program (except for the regulation) was adopted and operated in the finest traditions of the 350 year history of the state's caring for the medical needs of the poor.

In adopting the regulation, however, the state has ceased to preserve its neutrality at least under our state constitution. Under the program it provides funds for childbirth, but denies funds to terminate the pregnancy; it provides for all other necessary medical needs of the woman, save one—the medically necessary abortion. The fact that the regulation singles out one medical procedure flies in the face of the medicaid program's admitted goals. Indeed, the defendant commissioner admits that funding "medically-necessary abortions which protect a woman's health . . . contribute to [his] goals for the medicaid program."[38] And since that one exception also is a subject of a woman's constitutional rights, the regulation impinges upon those constitutional rights to the same practical extent as if the state were to affirmatively rule that poor women were prohibited from obtaining an abortion.

Justice Brennan's perspective of impingement on the constitutional right to privacy as expressed in his dissent in *McRae* has clear applicability to our state constitution. He wrote: "In every pregnancy, one of these two courses of treatment [termination of the pregnancy or medical procedures to bring the pregnancy to term] is medically necessary, and the poverty-stricken woman depends on the Medicaid Act to pay

---

[36] Budget Request of the Commissioner for the Fiscal Year of 1985.

[37] The defendants' admission of facts.

[38] The defendants' admission of facts.

for the expenses associated with that procedure. But under the Hyde Amendment, the Government will fund only those procedures incidental to childbirth. By thus injecting coercive financial incentives favoring childbirth into a decision that is constitutionally guaranteed to be free from governmental intrusion, the Hyde Amendment deprives the indigent woman of her freedom to choose abortion over maternity, thereby impinging on the due process liberty right recognized in *Roe* v. *Wade.*" *Harris* v. *McRae,* supra, 333 (Brennan, J., dissenting).

Since the poor woman's right of privacy is infringed by the regulation, so are the physician's rights. "[T]he full vindication of the woman's fundamental right necessarily requires that her physician be given 'the room he needs to make his best medical judgment.' *Doe* v. *Bolton,* [supra] . . . . The physician's exercise of this medical judgment encompasses both assisting the woman in the decision making process and implementing her decision should she choose abortion." *Akron* v. *Akron Center for Reproductive Health, Inc.,* supra, 427.

The Massachusetts Supreme Court likewise has found that the failure to pay for medically necessary abortions violated the due process clause of its state constitution. In *Moe* v. *Secretary of Administration & Finance,* 382 Mass. 629, 654–55, 417 N.E.2d 387 (1981), it was held that once the state "chooses to enter the constitutionally protected area of choice, it must do so with genuine indifference. It may not weigh the options open to the pregnant woman by its allocation of public funds; in this area, government is not free to 'achieve with carrots what [it] is forbidden to achieve with sticks.' L. Tribe, American Constitutional Law, § 15-10, [p.] 933 n.77 (1978)." Likewise, in striking down a similar statute which would restrict the funding of medically necessary abortions, the Supreme

Court of California in *Committee to Defend Reproductive Rights* v. *Myers,* 29 Cal. 3d 252, 264, 625 P.2d 779, 172 Cal. Rptr. 866 (1981), affirmed its long standing state constitutional principle that once benefits are conferred, it may not be done on "a selective basis which excludes certain recipients solely because they seek to exercise a constitutional right."

Moreover, infringement must be measured in the light of the "reality of the situation" that is, the effective removal of the choice for poor women of whether to have an abortion by not funding it as referred to by Justice Brennan in *Harris* v. *McRae,* supra, 333 (Brennan, J., dissenting), and the "practical considerations" of the person the regulation affects (that is, their inability to protect themselves) referred to by Justice Longo in *Fasulo* v. *Arafeh,* supra, 481.[39] As Justice Powell pointed out in *Healy* v. *James,* supra, 183, "[w]e are not free to disregard the practical realities."

## A

### THE POOR WOMAN'S DILEMMA

The "realities" and "practicalities" of this class of poor women is their abject poverty and desperate need of medical care in the form of therapeutic abortions interwoven with the dilemma with which the state has confronted them.

Under the Connecticut medicaid program, except for abortion, all necessary medical expenses for eligible recipients are paid for by the state. General Statutes, § 17-134b; Regs., Conn. State Agencies §§ 17-134d-1 and 17-134d-2. On the other hand, the state pays for all incidents necessary for childbirth, including delivery and the costs of medical care resulting from complications during pregnancy. So if the pregnant poor woman finds herself requiring an abortion to preserve

---

[39] The plaintiffs were involuntarily confined psychiatric patients in *Fasulo* v. *Arafeh,* 173 Conn. 473, 378 A.2d 553 (1977).

her health, she has no place to turn. The state has placed her in a trap. The cash welfare allowance (AFDC) the state grants is barely sufficient to maintain an adequate level of living for her and her family. Her benefits from the state are substantially under the poverty levels, and the cash allotment is hardly enough to cover food, shelter and clothing.[40] Through an intricate network of statutes, she is not allowed to receive funds from other sources without those funds being deducted from her welfare cash allowance the following month.[41] Thus, even a loan from a friend or family member would not help her, the obligations of repayment notwithstanding. And if she should fail to report the receipt of other income and assets, she could become disqualified for future benefits and subject to criminal charges.[42] Because payments are made directly to the provider and no cash allowance is given for medical assistance, she is not even given the choice of being able to forego other medical necessities in favor of the abortion. In short, the state has boxed her into accepting the pregnancy and carrying the fetus to term, notwithstanding the sometimes substantial impairment to her health. Faced with this dilemma, some women have resorted to desperate and dangerous acts of self-abortion,[43] criminal activity and illegal abortions in

---

[40] See part III, supra.

[41] General Statutes §§ 17-82j, 17-83e.

[42] General Statutes §§ 17-82d, 17-82i (b); Regs., Conn. State Agencies §§ 17-2-9, 17-2-39 through 17-2-43.

[43] Doe No. 3 testified as follows:

"Q. What would you have done [if the state had not paid for the abortion under the injunction]? What were you thinking that you would have had to do if welfare had not paid for your abortion?

"A. Well, when you are in such a situation, you . . . do crazy things really, you know, even though you do not have the right to do it or anything. I would have probably done something very dumb.

"Q. What would you have done?

"A. You know, in Columbia, people do a lot of dumb things that I know. I probably would have. I know people who does this. I would have done

order to exercise their constitutional rights. The only legal relief available is to allow the indigent woman's medical condition to worsen to a point where her life is endangered—only then, will the state come to her aid and fund the abortion. By then, however, it may be too late, for even if the medical condition does not kill her, the abortion procedure at an advanced stage of pregnancy may.

The cruelty of the regulation is demonstrated by a sampling of the medically necessary abortions which would not have been eligible for funding under a life-endangerment standard but were funded by the state pursuant to the temporary mandatory injunction ordered by the court. For example: a thirteen year old girl who began vomiting five times a day, and developed an acute state of depression which was characterized by frequent crying spells and which interfered with her progress at school; a woman whose pregnancy was the result of rape and who was acutely depressed; a woman who was at risk of septic abortion because she became pregnant with an intrauterine contraceptive device in place which could not be removed; a woman with a reaction of anxiety and stress who also had hepatitis; a woman with an anxiety reaction who also had hypertension; a woman who had lupus erythematosus; a woman with pancreatitis; a woman with serious threats to her health from a failed prior attempt at an abortion with subsequent pain, bleeding and probably severe infection; a woman at risk because of a cardiac valve lesion who is also on medication

---

it. I could have grabbed a handle and make a wire and put it over there and do something.

"Q. You would have tried to abort yourself?

"A. I would have done it, yes. I would have tried. I don't know. Because you have to do something if it was going to be a torment. I was not physically ready to have a baby. And, it was going to be a big, big, problem. I don't know how I would have handled it, but I would have done something real bad."

known to have ill effects on pregnancy; a woman whose fetus could not survive outside of the womb because it had anencephaly; a woman who was at risk because she was both hypertensive and asthmatic; a woman who was at risk and whose fetus was also at risk because she had a history of drug abuse and was currently on a methadone program; a woman with a history of psychiatric illness who became emotionally unstable during pregnancy and needed medication for her mental health; and a woman who was at risk because she had sickle-cell anemia which is associated with a high rate of complication during pregnancy.

## B

### THE PHYSICIAN'S DILEMMA

The failure to pay for medically necessary abortions interferes with the physician-patient relationship. The inability to perform this medical procedure places physicians in an untenable position. They may be forced to witness the deterioration of their patient's health and the shortening of her life expectancy. They may face the increase likelihood of having to perform the abortion at an advanced stage of the pregnancy when the abortion procedure is more dangerous.[44] They know of the possibility that their patients may attempt to abort themselves and that they will then be forced to render vigorous time-consuming and difficult treatment to save her. Indeed, because the physician was unable to perform the abortion when it was medically neces-

---

[44] Frederick Naftolin, chairman of the department of obstetrics and gynecology at Yale Medical School and at Yale-New Haven Hospital, testified as follows:

"Naftolin: First I should say at the outset that in general it is a very difficult standard because life endangerment means that one has to be able to foresee the outcome of a pregnancy at the very beginning of the pregnancy, which is, I wish it were easier, but it is not."

"The Court: By that you mean that at the initial stages of the pregnancy, it might just be medically necessary, but as the pregnancy continues, it might become life endangerment?"

"Naftolin: Precisely."

sary, he or she may be put in the position of not being able to save her life when the abortion is performed under the regulation. Moreover, at each of these phases, the physician must apply life-endangerment standards that are alien and antithetical to the medical profession. Dr. David Bingham, an obstetrician and gynecologist summed it up as follows: "I feel that the state has obstructed my ability to give the best care that I know how to give. That it has a policy . . . which may drive some patients to the brink before we can help them and which has forced many women to continue their pregnancies to the detriment of their health. And as a physician whose life work is to protect their health, it's clearly an enormous burden that, I believe, the state placed on us as well as on our patients."

Although the court decides this case on state constitutional grounds, it is clear that in light of the present facts the regulation could not pass federal constitutional standards even under the majority's analysis in *Harris* v. *McRae*. In *McRae* the United States Supreme Court held that the "refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *Harris* v. *McRae,* supra, 317 n.19. In this case, however, the dilemma in which poor women find themselves as a request of the failure to fund medically necessary abortions is the "more."[45] The

[45] Indeed, because *appropriate* medical care is the mark of the medicaid program, the case fits the mold of *Sherbert* v. *Verner,* 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963). The *McRae* majority conceded the following: "A substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate, simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion. This would be analogous to *Sherbert* v. *Verner,* [supra], where this Court held that a State may not, consistent with the First and Fourteenth Amendments, withhold *all* unemployment compensation benefits from a claimant who would otherwise be eligible for such benefits but for the fact that she is unwilling to work one day per week on her Sabbath." (Emphasis in original.) *Harris*

infringement of the protected right is not only the failure to fund the therapeutic abortion, but it is also the additional obstacles placed in the path of the woman which make it impossible for her to exercise her constitutional right to obtain an abortion and preserve her health without violating the law. Although, under federal constitutional law, "a state is not constitutionally compelled to pay to remove financial burdens it did not impose, the cases clearly gave no license to the converse, the idea that government is free to *create* financial [or other] obstacles to abortion." (Emphasis in original.) *National Education Assn. of Rhode Island* v. *Garrahy,* 598 F. Sup. 1374, 1384 (D.R.I. 1984), aff'd, 779 F.2d 790 (1st Cir. 1986); *American College of Obstetricians* v. *Thornburgh,* 737 F.2d 283, 303 (3d Cir. 1984).

The Hyde amendment is no mere "omission"; it is a deliberate attempt to curb abortion. Just because the regulation piggybacks the amendment, it doesn't wash any differently in its effects on the women's constitutional right of privacy. "[W]hat appears at first to be merely a governmental 'omission'—for example, failure to fund therapeutic abortions for poor women accompanied by funding of childbirth procedures for the same women—might be regarded, and has in fact

v. *McRae,* 448 U.S. 297, 317 n.19, 100 S. Ct. 2671, 65 L. Ed. 2d 784, reh. denied, 448 U.S. 917, 101 S. Ct. 38, 65 L. Ed. 2d 1180 (1980). In the present case the *"benefit"* at stake under the medicaid program goes further than just necessary medical care. Under the Connecticut program *appropriate* medical care is the benefit which is provided and the only appropriate medical care for these poor women is an abortion. It is undisputed that when a woman requires a therapeutic abortion, carrying the fetus to term which jeopardizes her health and possibly her life, is *not appropriate* medical care. The benefit (the right to appropriate medical care) is withheld in its entirety when the state will not fund this *single, appropriate medically necessary* procedure. Therefore, because the poor woman chooses to exercise her constitutional right for an abortion, all of the appropriate care is withdrawn. And clearly this not only fails to pass state, but also federal, constitutional muster.

been viewed by some Supreme Court justices, as a deliberate, 'active' choice by government to discourage exercise of a negative individual right." L. Tribe, "The Abortion Funding Conundrum: Inalienable Rights, Affirmative Duties, and the Dilemma of Dependence," 99 Harv. L. Rev. 330, 331 (1985). "That a state may not structure its programs of benefits so as to deter or penalize the exercise of protected rights without compelling justification is the rule even though it may be exceedingly difficult in particular cases to decide whether a program really does have such a forbidden effect or structure." L. Tribe, Constitutional Choices (1985) p. 56. In this case, however, the court has no difficulty determining that the regulation, within the framework of the Connecticut medicaid program, does impinge on the constitutional right of privacy.

Whatever the analysis and no matter how tight and opaque the state's blindfold becomes, the excepting from the medicaid program of one single medical procedure which is absolutely necessary to preserve the health of the woman (the medically necessary abortion) constitutes an infringement of the right of privacy at least under the constitution of the state of Connecticut. Such infringement triggers a judicial review as to whether the regulation meets constitutional muster.

Both the woman's and physician's right of privacy are not unqualified even under the state constitution. Since the regulation impairs a fundamental right, its validity requires "strict scrutiny to determine whether the regulation was compellingly justified and narrowly drafted." *Campbell* v. *Board of Education,* 193 Conn. 93, 104, 475 A.2d 289 (1984).

The federal courts have identified two such interests that may justify state regulation of abortion; *Akron* v. *Akron Center for Reproductive Health, Inc.,* supra 427; and it makes logical sense that these could also be

advanced as compelling reasons under the state constitution.[46] First, " 'the State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman.' " Id., 428. Of course, this reason has no application to the present case because the interest would compel an abortion rather than deny it.

Second, the state "has still *another* important and legitimate interest in protecting the potentiality of human life." Id. The state asserts the interest as controlling here, citing for support § 53-31a of the General Statutes, which, although it has been declared unconstitutional,[47] is still carried forward by the state from revision to revision of the statutes. That statute provides in part: "The public policy of the state and the intent of the legislature is to protect and preserve human life from the moment of conception . . . ." Under the judicial review of strict scrutiny, however, this reason cannot justify the impingement of the right to an abortion. Although the protection of potential life is important, it cannot outweigh the health of the woman at any stage of the pregnancy (first, second or third trimesters). *Akron* v. *Akron Center for Reproductive Health, Inc.,* supra, 428; *Roe* v. *Wade,* supra, 163–65; *Moe* v. *Secretary of Administration & Finance,* supra, 658; *Right to Choose* v. *Byrne,* supra, 306. It is crystal clear the poor woman may not be denied medical benefits solely to protect the potentiality of human

---

[46] The defendants, in their brief, identify four reasons they advance as compelling—that is, "protect[ing] and preserv[ing] human life from the moment of conception," "favoring childbirth over abortion," "safeguarding health" and "maintaining medical standards." In regard to potential life and childbirth, it is clear, as indicated in this decision, that these reasons must give way to the woman's health. The abortion procedure itself serves the reason of safeguarding health. It is further clear that the standards of the medical profession do not prohibit, but rather require and are consistent with the abortion for medically necessary reasons.

[47] *Abele* v. *Markle,* 369 F. Sup. 807 (D. Conn. 1973).

life or life itself when her physician "in appropriate medical judgment" determines the abortion is medically necessary "for the preservation of the life *or* health" of the woman. (Emphasis added.) *Roe* v. *Wade,* supra, 164–65.

The state has failed to prove that there is any compelling reason to justify the regulation.[48] Accordingly, the court finds that the regulation which prohibits the funding of medically necessary abortions under the medicaid program except if the life of the woman is endangered violates the rights of privacy of the plaintiff poor woman class and the physician class under the state's due process clause.

## VIII
### EQUAL PROTECTION AND THE EQUAL RIGHTS AMENDMENT

The plaintiffs also argue that the regulation violates the equal protection clauses of our state constitution

---

[48] It is difficult to understand the state's claim of justification. If the potential for human life is compelling, why during the period of the temporary injunction did it voluntarily fund abortions for children and women who did not come within the medicaid program, and therefore was not in the purview of the injunction? For example, medically necessary abortions were funded for those who were not eligible for medicaid in the state-funded program for eighteen to twenty-one year olds, persons eligible for general assistance and youth in the care of the Connecticut department of children and youth services.

It should also be noted, which the defendants apparently find difficult to explain, that the State Health Plan prepared by the health coordinating council (promulgated pursuant to General Statutes § 19a-7 and National Health Planning Resources Development Act of 1974, Pub. L. No. 93-641, 42 U.S.C. § 300k et seq.) provides in part: "A full spectrum of reproductive and maternal services (e.g., prenatal, delivery, post-natal, family planning, *pregnancy termination,* infertility, genetic screening and counseling, and male and female sterilization) should be made available to all regardless of method of payment, socio-economic or ethnic status, age, sex, or geographic location." (Emphasis added.)

contained in §§ 1[49] and 20[50] of article first and more specifically under the equal rights amendment (hereinafter "ERA") adopted as an amendment to § 20 in 1974.[51]

The five member majority in *Harris* v. *McRae,* supra, held that the Hyde amendment did not violate the federal equal protection clause.[52] In *McRae,* the court held that since the restriction on medicaid abortions does not impinge on the constitutional right of liberty and the classification is not predicated on "criteria that are, in a constitutional sense, 'suspect,' " the validity of this classification must stand unless it fails to meet the rational basis test. Id., 322. The court found that such discriminatory restrictions on funding medically necessary abortions were rationally related to the legitimate governmental objective of "protecting the potential life of the fetus." Id., 324.

This court also finds it difficult to accept the rationale of the majority of the United States Supreme Court in *McRae,* even under the traditional two-tiered equal

---

[49] "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community." Conn. Const., art. I § 1.

[50] Prior to November 27, 1974, the equal protection clause was as follows: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin." Conn. Const., art. I § 20.

[51] Section 20 was amended on November 27, 1974 (article fifth of amendments) by adding "her" and "sex," and on November 28, 1984 (article sixteen of amendments) by adding "or physical or mental disability." Section 20 now reads as follows: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

[52] The court in *Williams* v. *Zbaraz,* 448 U.S. 358, 100 S. Ct. 2694, 65 L. Ed. 2d 831, reh. denied, 448 U.S. 917, 101 S. Ct. 38, 65 L. Ed. 2d 1180 (1980), also refused to strike down, on equal protection grounds, the Illinois statute which restricted the funding of abortions to those which were life-threatening.

protection review. Indeed, Justice Stevens vigorously dissented in *McRae* and argued that the Hyde amendment was violative of the federal equal protection clause. He stated the following: "If a woman has a constitutional right to place a higher value on avoiding either serious harm to her own health or perhaps an abnormal childbirth than on protecting potential life, the exercise of that right cannot provide the basis for the denial of a benefit to which she would otherwise be entitled. The Court's sterile equal protection analysis evades this critical though simple point. The Court focuses exclusively on the 'legitimate interest in protecting the potential life of the fetus. . . . It concludes that since the Hyde Amendments further that interest, the exclusion they create is rational and therefore constitutional. But it is misleading to speak of the government's legitimate interest in the fetus without reference to the context in which that interest was held to be legitimate. For *Roe* v. *Wade* squarely held that the States may not protect that interest when a conflict with the interest in a pregnant woman's health exists. It is thus perfectly clear that neither the Federal Government nor the States may exclude a woman from medical benefits to which she would otherwise be entitled solely to further an interest in potential life when a physician, 'in appropriate medical judgment,' certifies that an abortion is necessary 'for the preservation of the life or health of the mother. . . .' The Court totally fails to explain why this reasoning is not dispositive here." (Citations omitted.) *Harris* v. *McRae,* supra, 351–52.

The Connecticut equal protection clauses require the state when extending benefits to keep them " 'free of unreasoned distinctions that can only impede [the] open and equal' " exercise of fundamental rights. *D'Amico* v. *Manson,* 193 Conn. 144, 147, 476 A.2d 543 (1984), quoting *Rinaldi* v. *Yeager,* 384 U.S. 305, 310, 86 S. Ct.

1497, 16 L. Ed. 2d 577 (1966); *Gaines* v. *Manson,* 194 Conn. 510, 516, 481 A.2d 1084 (1984). The regulation does not satisfy this requirement. Clearly, the regulation discriminates by funding all medically necessary procedures and services except therapeutic abortions. As the court held in part VII of this decision, the selective funding of medically necessary abortions and the willingness of the state to fund all necessary medical procedures to bring the fetus to term at least implicitly impinges on the fundamental right of privacy guaranteed to all pregnant women—rich and poor alike—and that is, the right to choose whether to have an abortion. Since it impinges on a fundamental right, the defendants must establish both a compelling state interest in support of the classification and that no less restrictive alternative is available. See *Carofano* v. *Bridgeport,* 196 Conn. 623, 640, 495 A.2d 1011 (1985). Just as the state lacks a compelling reason under due process analysis to exclude abortion from medicaid funding at any stage of the pregnancy when the health of the woman is at stake, it also lacks such an interest for equal protection purposes. Under either analysis, the regulation which encourages a woman through financial coercion to bear children at the risk of their health does not meet constitutional standards.

The case of the plaintiff class of poor women is even stronger given Connecticut's ERA. By adopting the ERA, the "people of this state and their legislators have unambiguously indicated an intent to abolish sex discrimination." *Evening Sentinel* v. *National Organization for Women,* 168 Conn. 26, 34, 357 A.2d 498 (1975).

The regulation discriminates on the basis of sex in several ways. First, under the medicaid program, all the medical expenses necessary to restore the male to health are paid and likewise for the female *except* for therapeutic abortions that are not life-threatening. Second, all the male's medical expenses associated with

their reproductive health, for family planning and for conditions unique to his sex are paid and the same is provided for women *except* for the medically necessary abortion that does not endanger her life.

The third, and the most important way in which the regulation violates the ERA, requires some background. Since time immemorial, women's biology and ability to bear children have been used as a basis for discrimination against them. See generally Law, "Rethinking Sex and the Constitution," 132 U. Pa. L. Rev. 955 (1984). For some outrageous examples of this, see *Hoyt* v. *Florida*, 368 U.S. 57, 62, 82 S. Ct. 159, 7 L. Ed. 2d 118 (1961) (statute exempting women from jury duty because they are "regarded as the center of home and family life"); *Muller* v. *Oregon*, 208 U.S. 412, 421, 28 S. Ct. 324, 52 L. Ed. 551 (1908) (statute that restricted the hours women could work but did not place similar restrictions on men); *Bradwell* v. *Illinois*, 83 U.S. (16 Wall.) 130, 141–42, 21 L. Ed. 442 (1872) (Bradley, J., concurring) (decision prohibiting women from the practice of law because of "natural" differences between the sexes). This discrimination has had a devastating effect upon women.

Since only women become pregnant, discrimination against pregnancy by not funding abortion when it is medically necessary and when all other medical expenses are paid by the state for both men and women is sex oriented discrimination.[53] "Pregnancy is a condition unique to women, and the ability to become pregnant is a primary characteristic of the female sex. Thus any classification which relies on pregnancy as the determinative criterion is a distinction based on sex." *Massachusetts Electric Co.* v. *Massachusetts Commis-*

---

[53] *Fischer* v. *Department of Public Welfare*, 509 Pa. 293, 502 A.2d 114 (1985); but see trial court opinion, 85 Pa. Commw. 215, 482 A.2d 1137 (1984); exceptions sustained in part and overruled in part, 85 Pa. Commw. 240, 482 A.2d 1148 (1984).

*sion Against Discrimination,* 375 Mass. 160, 167, 375 N.E.2d 1192 (1978); see also *General Electric Co.* v. *Gilbert,* 429 U.S. 125, 149, 97 S. Ct. 401, 50 L. Ed. 2d 343 (1976) (Brennan, J., dissenting); L. Tribe, American Constitutional Law § 16.27; Johnsen, "The Creation of Fetal Rights: Conflicts with Women's Constitutional Rights to Liberty, Privacy, and Equal Protection," 95 Yale L.J. 599, 621–22 (1986). Tribe put it well when he wrote: "If one were . . . to recognize, as the Supreme Court sometimes has, that 'the grossest discrimination can lie in treating things that are different as though they were exactly alike' [quoting from *Jenness* v. *Fortson,* 403 U.S. 431, 442, 91 S. Ct. 1970, 29 L. Ed. 2d 554 (1971)], then it might be possible to discern an invidious discrimination against women, or at least a constitutionally problematic subordination of women, in the law's very indifference to the biological reality that sometimes requires them, but never requires their male counterparts, to resort to abortion procedures if they are to avoid pregnancy and childbearing." L. Tribe, Constitutional Choices (1985) p. 244.[54]

[54] Justice Frankfurter, in his concurring opinion in *Griffin* v. *Illinois,* 351 U.S. 12, 23, 76 S. Ct. 585, 100 L. Ed. 891, reh. denied, 351 U.S. 958, 76 S. Ct. 844, 100 L. Ed. 1480 (1956), which held that due process and equal protection requires the state to pay for the transcript of a criminal trial for an indigent defendant, stated the following: "Law addresses itself to actualities. It does not face actuality to suggest that Illinois affords every convicted person, financially competent or not, the opportunity to take an appeal, and that it is not Illinois that is responsible for disparity in material circumstances. Of course a State need not equalize economic conditions. A man of means may be able to afford the retention of an expensive, able counsel not within reach of a poor man's purse. Those are contingencies of life which are hardly within the power, let alone the duty, of a State to correct or cushion. But when a State deems it wise and just that convictions be susceptible to review by an appellate court, it cannot by force of its exactions draw a line which precludes convicted indigent persons, forsooth erroneously convicted, from securing such a review merely by disabling them from bringing to the notice of an appellate tribunal errors of the trial court which would upset the conviction were practical opportunity for review not foreclosed.

"To sanction such a ruthless consequence, inevitably resulting from a money hurdle erected by a State, would justify a latter-day Anatole France to add

It is absolutely clear that the framers intended that pregnancy discrimination would come within the purview of the sex discrimination prohibited by Connecticut's ERA and should be subject to heightened judicial review. Senator Joseph I. Lieberman, who led the ERA debate on the floor of the Senate, used as an example a law denying women "unemployment compensation two months before and after childbirth," as an example of a law that would be barred by the ERA. 15 S. Proc., Pt. 4, 1972 Sess., p. 1526. Senator Lawrence J. DeNardis expressed the intention of the vast majority of the senate as follows: "[T]here often comes a point when in the life of a body politic, it must reassert the values that are inherent in the spirit of the Constitution." Id., p. 1543. In sum, by adopting the ERA, Connecticut determined that the state should no longer be permitted to disadvantage women because of their sex including their reproductive capabilities. It is therefore clear, under the Connecticut ERA, that the regulation excepting medically necessary abortions from the medicaid program discriminates against women, and, indeed, poor women.

Having concluded that the regulation discriminates based upon sex, the court must next determine the appropriate level of judicial review to apply in order to determine whether it offends the ERA. The defendants argue, based upon *McRae,* that the rational relationship test should be applied. Although the Supreme Court of Connecticut has often stated that the equal protection provisions of the Connecticut and United States constitutions "have the same meaning and limitations"; *Keogh* v. *Bridgeport,* 187 Conn. 53, 66, 444 A.2d 225 (1982); those pronouncements were made

---

one more item to his ironic comments on the 'majestic equality' of the law. 'The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread.' (John Cournos, A Modern Plutarch, p. 27)."

without reference to the ERA. Since the adoption of the ERA those decisions of the Supreme Court of Connecticut which paid lip service to this traditional language did not involve gender classification. To equate our ERA with the equal protection clause of the federal constitution would negate its meaning given that our state adopted an ERA while the federal government failed to do so. Such a construction is not reasonable.

Some jurisdictions have interpreted their state ERA's as requiring *absolute scrutiny*, that is, the court will not consider any justification for sex discrimination once it has been found. For example, the Supreme Court of Washington has held that "[t]he ERA, on the other hand, is a very different animal from the equal protection clause—indeed, it has no counterpart in the federal constitution. The ERA absolutely prohibits discrimination on the basis of sex and is not subject to even the narrow exceptions permitted under traditional 'strict scrutiny.' . . . The ERA mandates equality in the strongest of terms and absolutely prohibits the sacrifice of equality for *any* state interest, no matter how compelling, though separate equality may be permissible in some very limited circumstances . . . ." (Emphasis in original.) *Electric Contractors* v. *Pierce County,* 100 Wash. 2d 109, 127, 667 P. 2d 1092 (1983);[55]

---

[55] "Presumably the people in adopting . . . [the ERA] intended to do more than repeat what was already contained in the otherwise governing constitutional provisions, federal and state, by which discrimination based on sex was permissible under the rational relationship and strict scrutiny tests. Any other view would mean the people intended to accomplish no change in the existing constitutional law governing sex discrimination . . . . Had such a limited purpose been intended, there would have been no necessity to resort to the broad, sweeping, mandatory language of the Equal Rights Amendment. See Comment, "Sex Discrimination in Interscholastic High School Athletics," 25 Syracuse L. Rev. 535, 570–74 (1974). . . . The overriding compelling state interest as adopted by the people of this state . . . is that: 'Equality of rights and responsibility under the law shall not be denied or abridged on account of sex.' " *Darrin* v. *Gould,* 85 Wash. 2d 859, 871, 877, 540 P.2d 882 (1975).

see also *Rand* v. *Rand,* 280 Md. 508, 511–16, 374 A.2d 900 (1977); Brown, Emerson, Falk & Freedman, "The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women," 80 Yale L.J. 871, 904 (1971). Although the argument for absolute scrutiny is impressive, the court need not decide whether it is required by the Connecticut ERA since the regulation cannot survive strict scrutiny and, indeed, not even an intermediate review.[56]

At the very least, the standard for judicial review of sex classifications under our ERA is strict scrutiny. Surely the effect of the ERA was to raise the standard of review. In *Page* v. *Welfare Commissioner,* 170 Conn. 258, 267, 365 A.2d 1118 (1976), the Supreme Court of Connecticut made a point of noting that the state did not deny "that the passage of the equal rights amendment mandates the use of a 'strict scrutiny' test . . . ." In *Page,* however, the court did not need to decide whether strict scrutiny applied because it con-

---

[56] Even if the court was to apply an intermediate standard of review, the regulation could not pass constitutional muster. "Courts have tended to depart from the minimal standard where the interests affected by the governmental restriction are sufficiently elevated in the hierarchy of social values and to devise various formulae less rigid than the compelling state interest criterion that essentially necessitate balancing private against governmental concerns with varying degrees of deference to legislative judgment." *Carafano* v. *Bridgeport,* 196 Conn. 623, 641, 495 A.2d 1011 (1985); *Horton* v. *Meskill,* 195 Conn. 24, 37, 486 A.2d 1099 (1985). Such a balancing standard was applied by the Supreme Court of New Jersey in *Right to Choose* v. *Byrne,* 91 N.J. 287, 450 A.2d 925 (1982). Although New Jersey does not have an equal rights amendment, in *Right to Choose* the court held " 'where an important personal right is affected by governmental action, the Court often requires the public authority to demonstrate a greater 'public need' than is traditionally required in construing the federal constitution.' " Id., 309. The court went on to hold: "This balancing test is particularly appropriate when, as here, the statutory classification indirectly infringes on a fundamental right. In balancing the protection of a woman's health and her fundamental right to privacy against the asserted state interest in protecting potential life, we conclude that the governmental interference is unreasonable." Id., 310.

cluded that the legislation could not survive any test. Likewise, in *Stern* v. *Stern,* 165 Conn. 190, 193, 332 A.2d 78 (1973), Justice Loiselle, speaking for a unanimous court, acknowledged that the level of review would be a different ballgame under ERA. See also *R.McG.* v. *J.W.,* 200 Colo. 345, 615 P.2d 666 (1980); *People* v. *Ellis,* 57 Ill. 2d 127, 311 N.E.2d 98 (1974); *Attorney General* v. *Massachusetts Interscholastic Athletic Assn., Inc.,* 378 Mass. 342, 393 N.E.2d 284 (1979). It is certain, as previously stated in part VII of this decision, that the defendants are unable to meet their burden of proving that a compelling state interest supports the classification and that no less restrictive alternative is available.

The court concludes that the regulation that restricts the funding for medically necessary abortions except when the woman's life is endangered violates the equal protection clause of the constitution of the state of Connecticut and more specifically Connecticut's equal rights amendment.

## IX

### Conclusion and Remedy

The court finds the issues in favor of the plaintiff classes of poor women and physicians. The court does not take lightly the issuance of this injunction against the defendants, but the circumstances here are compelling. *Monroe* v. *Middlebury Conservation Commission,* 187 Conn. 476, 480, 447 A.2d 1 (1982). The commissioner has clearly acted in excess of his statutory authority which has resulted in the deprivation of the plaintiff classes of their constitutional rights. For the plaintiff class of poor women, the regulation has jeopardized their health and could reach a level for them where it becomes life-threatening. We do not deal here with mere property or privileges—but with life itself. Furthermore, an important consideration is that the

action which the court finds to be illegal and unconstitutional is not predicated upon a legislative enactment, but that which first had its existence as a mere policy of the commissioner.[57] It is clear, and the court so finds, that the enforcement of the regulation would cause the plaintiffs irreparable injury and they have no adequate remedy at law. *Connecticut Mobile Home Assn., Inc.* v. *Jensen's, Inc.,* 178 Conn. 586, 592, 424 A.2d 285 (1979).

The court declares that the regulation; 3 Manual, Department of Income Maintenance Medical Assistance Program, c. III, Policy 275; which provides for the funding of abortion under the medicaid program only when necessary to preserve the physical life of the woman or when pregnancy is the result of rape or incest, to be:

(a) contrary to the statutory provisions of the medicaid program; General Statutes § 17-134a et seq.; and specifically § 17-134b of the General Statutes, and that therefore the commissioner of income maintenance exceeded his authority in adopting it;

(b) in violation of the plaintiff class of poor women's and the plaintiff class of physicians' constitutional rights of due process under article first, § 10, of the constitution of the state of Connecticut;

(c) in violation of the plaintiff class of poor women's constitutional right of equal protection under article first, §§ 1 and 20 (including the equal rights amendment, article five of the amendments), of the constitution of the state of Connecticut.

The court enjoins the defendant commissioner from enforcing said regulation and orders that the defendants pay for the costs of all medically necessary abortions; see footnote 4, supra; on the same basis, to the same extent and with the same limitations as the

---

[57] See footnote 10, supra.

defendants pay for all other medical expenses under the medicaid program.

Counsel for the plaintiffs, within seven days, shall prepare a judgment file and submit it to counsel for the defendants for their comments as to form. The court will hear the parties on the form of the judgment at the time the bifurcated issue of attorney's fees is considered.